IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| VANESSA WINCHESTER-SYE, | ) Civ. No. 12-00592 ACK-KSC |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| COUNTY OF HAWAII, and DOES 1-10, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## ORDER GRANTING THE COUNTY'S MOTION FOR SUMMARY JUDGMENT

For the following reasons, the Court hereby GRANTS the
County's Motion for Summary Judgment on all claims.

### FACTUAL BACKGROUND[1]

This action arises from County of Hawaii police
officers' alleged forcible restraint and transport of pro se
Plaintiff Vanessa Winchester-Sye.

On the morning of November 2, 2010, Plaintiff was at
her daughter Zipporah's house. Zipporah states that Plaintiff
suffers from mental illness, specifically that she is bipolar,
and that on the morning in question she seemed "very hyper,"
"looked very different," was "acting too crazy," and was speaking
in some language other than English that Zipporah could not
understand. (Mot., Ex. B (Dep. of Zipporah Alexis Sye) at 6-7,
14.) Plaintiff had a large bruise on her face, which was the

---

[1] The facts as recited in this order are for the purpose of
disposing of the current motion and are not to be construed as
findings of fact that the parties may rely on in future
proceedings.

result of hitting her face with a car door a few days prior. (Mot., Ex. E (Dep. of Vanessa Winchester-Sye) at 70.) Plaintiff apparently told Zipporah that she believed herself to be a "holy priestess" and that she could only speak "her ancient language." (Mot., Ex. B at 17-18.) Plaintiff has herself subsequently stated during a deposition that she was on a "vision quest" and that she was speaking a "spiritual language." (Mot., Ex. E at 67-68.)

Zipporah states that her mother "kind of scared me because I guess she was saying like she was coming for like my son, to like, I guess, to be part of this mission of her – I guess her holiness or whatever . . . ." (Mot., Ex. B at 17.) Zipporah further states that her mother "just wasn't acting normal . . . and she seemed kind of . . . aggressive and I was pretty concerned." (Id. at 24.) Apparently Plaintiff attempted to enter Zipporah's house and "grab [her] son," but Zipporah prevented her from entering and called 911. (Id. at 24-25.) Zipporah told the 911 operator that her mother was mentally ill and "needs hospital help, not really police." (Id. at 25.)

Several police officers arrived on the scene and found Plaintiff in the garage area of the home, "ranting and raving in a loud voice in an unknown language" and "waiving her arms." (Mot., Ex. I (Decl. of Officer Belinda Kahiwa) at ¶¶ 6, 9.). Officer Kahiwa states that she tried to calm Plaintiff down by speaking to her in a "calm tone" in English, and repeatedly

2

requesting that Plaintiff speak to her in English. (Id. at ¶ 9; Mot., Ex. B. at 26.) Plaintiff continued speaking in an incomprehensible manner. (Mot., Ex. I at ¶ 9; Ex. E at 87.)

At some point while Officer Kahiwa was attempting to communicate with Plaintiff, the paramedics arrived. One of the paramedics for the Hawaii County Fire Department, Michael Brigoli, also attempted to speak with Plaintiff and calm her down. (Mot., Ex. J (Decl. of Michael Brigoli) at ¶ 5.) Plaintiff did not respond, and appeared to be "incapable of interacting with other individuals and the environment around her," and "in her own world and not in reality." (Id. at ¶ 6.) Plaintiff's family members who were present apparently informed Brigoli that Plaintiff was bipolar, that she had recently hit her head, and that her behavior had become more erratic after this injury. (Id. at ¶ 7.) Brigoli states that, in addition to his concerns regarding Plaintiff's bipolar disorder, he was concerned that she may have suffered a traumatic brain injury. (Id.) Brigoli believed that, at the time, Plaintiff posed a danger to herself and others. (Id. at ¶ 6.)

After several minutes of the police officers' and paramedics' attempts at communicating with Plaintiff, Officer Kahiwa apparently attempted to touch Plaintiff's hands "in an effort to communicate with her." (Mot., Ex. I at ¶ 10.) Plaintiff immediately yanked her arm away from Officer Kahiwa and continued

to "rant and rave in an angry manner while waving her arms."
(Id.; Mot., Ex. B at 29) When the paramedics attempted to
persuade Plaintiff to voluntarily get on a gurney to be
transported to an ambulance, Plaintiff ran to her car and got in
the driver's seat. (Mot., Ex. L (Decl. of Officer Cacique
Melendez) at ¶ 7.) Plaintiff testified at the hearing on the
instant Motion that she did so to retrieve her medication and
give the officers information regarding her doctors. The police
officers and paramedics at the scene believed that Plaintiff was
not capable of safely driving a car in her current state, and
that she would be a danger to herself and others behind the
wheel. (Mot., Ex. I at ¶ 11; Ex. J at ¶ 6; Ex. L at ¶ 7.)

At that point another officer, Officer Cacique
Melendez, approached the passenger side of Plaintiff's car and
tried to persuade her to exit the vehicle. (Mot., Ex. L at ¶ 8.)
Plaintiff refused and picked up a wooden cane, or lomi stick, and
started "swinging it at [Officer Melendez] in a combative
manner." (Id.) Officer Melendez grabbed the other end of the cane
"to prevent [Plaintiff] from injuring [him]," the two struggled
over the cane, and the cane eventually broke. (Id.; Mot., Ex. E
at 89; Ex. I at ¶¶ 11-12.) Plaintiff admits that she "became
belligerent" and "very upset" at that point, and screamed at the
officer. (Mot., Ex. E at 89.)

Officer Melendez then moved to the driver's side of the

vehicle and he and Officer James Cameros pulled Plaintiff out of
the car. (Mot., Ex. L at ¶ 9; Ex. D (Dep. of Lazareth Sye) at 28;
Ex. K (Decl. of James Cameros) at ¶ 8.) Officer Melendez states
that Plaintiff spat at him and Officer Cameros "at least two or
three times." (Mot., Ex. L at ¶ 9.) Plaintiff states that the
officers "might have thought I was intentionally spitting on
them, but that was not my intent." (Mot., Ex. E at 110.)
Plaintiff stated at the hearing that she fell to the ground and
her dress was pulled up and she hit her head when the officers
pulled her out of her vehicle. Once out of the car, Plaintiff
then bent over at the waist with her arms locked in front of her
in an effort to prevent the officers from pulling them apart and
restraining her. (Id. ¶ 10.) Officer Kahiwa approached the three
and tried to pull Plaintiff's arms apart, at which point
Plaintiff bit her. (Id.; Mot., Ex. I at ¶¶ 13-14; Ex. J at ¶ 10;
Ex. K at ¶ 9.) Officer Kahiwa had trouble getting her arm away
from Plaintiff, and was later treated by the paramedics for the
bite. (Mot., Ex. I at ¶ 15.) Plaintiff admits she bit an officer,
but does not know which one. (Mot., Ex. E at 108.)

Officer Cameros states that, after Plaintiff bit
Officer Kahiwa, he "yelled out 'Taser, Taser' to warn all persons
including the police that I was going to deploy the Taser."
(Mot., Ex. K at ¶ 10.) Officer Melendez states that he heard
Officer Cameros give the warning. (Mot., Ex. L at ¶ 11.) Officer

Cameros states that he then activated his Taser and shot the darts into Plaintiff's back and shoulder. (Mot., Ex. K at ¶ 10.) The Taser apparently had no effect, however, as Plaintiff continued to resist. (<u>Id.</u>; <u>see also</u> Mot., Ex. J at ¶ 11.) Plaintiff states that she remained standing after Officer Cameros used the Taser for the first time. (Mot., Ex. E at 103-04.)

When the Taser had no effect on Plaintiff, Officer Cameros used it twice more, this time in Drive-Stun mode on Plaintiff's thigh. (Mot., Ex. K at ¶ 10.) Officer Cameros states that the Taser still appeared to have no effect on Plaintiff. (<u>Id.</u>; <u>see also</u> Mot., Ex. J at ¶ 12.) In total, Officer Cameros states that he used the Taser three times on Plaintiff. (Mot., Ex. K at ¶ 10.) Plaintiff states that she was Tasered five times. (Mot., Ex. E at 104.) The last time the Taser was used, Plaintiff became submissive and was restrained, placed in an ambulance, and transported to Hilo Medical Center by the paramedics. (Mot., Ex. J at ¶¶ 12-13; Ex. K at ¶ 10; Ex. L at ¶¶ 12-13.) Mr. Brigoli, the paramedic at the scene, states that Plaintiff remained restrained during the ambulance ride because "she was violent and posed a danger to herself and others." (Mot., Ex. J at ¶ 13.) He further states that she did not appear to have suffered any injuries as a result of the altercation with the police or the use of the Taser. (<u>Id.</u> at ¶ 15.)

## PROCEDURAL BACKGROUND

On November 1, 2012, Plaintiff filed a Complaint in this Court against the County of Hawaii and Doe Defendants, alleging a number of federal civil rights claims and state law tort claims.

On March 18, 2013, the Court issued its Order Granting Motion to Dismiss, in which the Court dismissed all of the claims in the Complaint, and granted Plaintiff leave to amend.[2/] (Doc. No. 23.) Plaintiff filed several subsequent amended complaints, the most recent, operative complaint being her Third Amended Complaint, filed on July 18, 2013. (Doc. No. 52.) In her Third Amended Complaint, Plaintiff brings the following claims against the County of Hawaii: federal civil rights claims under 42 U.S.C. § 1983 for (1) excessive force and "deprivation of rights"; and (2) failure to comply with the regulations and practices of the Hawaii Police Department; and state law tort claims for (4) "rule violations" (failure to comply with the rules, regulations, and practices of the Hawaii Police Department); (5) negligent hiring, training, supervising, monitoring, and disciplining; and (6) assault and battery on a theory of respondeat superior.

On June 30, 3014, the County filed its Motion for

---

[2/] The Court originally dismissed Plaintiff's claims against the County for assault and battery with prejudice; however, on April 30, 2013, the Court issued its Order Granting Motion to Amend Judgment, in which the Court amended its March 18, 2013 Order by dismissing Plaintiff's assault and battery claim without prejudice. (Doc. No. 39.)

Summary Judgment on All Claims, along with a concise statement of

facts and a number of exhibits. (Doc. Nos. 116 & 117.) Plaintiff

did not file an opposition, notwithstanding the Court's efforts

to encourage her to do so.[3] A hearing on the Motion was held on

October 23, 2014. Plaintiff appeared in person and provided

testimony in opposition to the Motion.[4]

_____

[3] The hearing on the Motion was originally set for October
15, 2014; however, the Court continued the hearing to give
Plaintiff additional time in which to file an opposition. (Doc.
No. 122.) Plaintiff nevertheless failed to timely file any
opposition, although she did appear in person at the hearing on
the Motion. Nevertheless, a district court may not grant a motion
for summary judgment simply because the nonmoving party does not
file opposing material. Marshall v. Gates, 44 F.3d 722, 723-25
(9th Cir. 1995); Henry v. Gill Indust. Inc., 983 F.2d 943, 950
(9th Cir. 1993). A district court may, however, grant summary
judgment when the unopposed moving papers are sufficient on their
face and show that no issues of material fact exist. See Henry,
983 F.2d at 950; Vargas v. United States, 60 F.3d 835 (9th Cir.
1995).

[4] At the end of the hearing, Plaintiff made an oral request
for another continuance to give her more time to find an
attorney. The Court has already continued the Motion once,
specifically for the purpose of allowing Plaintiff additional
time to respond. Indeed, the courtroom manager spoke with
Plaintiff on the phone at least two times prior to the hearing in
an effort to aid her in complying with the Local Rules. After the
first phone conversation, the Court continued the hearing to give
Plaintiff additional time to respond to the Motion. When
Plaintiff still failed to file any response, the courtroom
manager contacted her again to ensure that she understood her
filing responsibilities and deadlines. During this second
conversation, Plaintiff represented that she did not intend to
file any written response to the Motion, but that she would
attend the hearing in person and testify on her own behalf. At no
time during the conversation did Plaintiff request a continuance
to seek new counsel. The Motion was filed on June 30, 2014,
almost four months ago, and Plaintiff's prior counsel withdrew
from the case several days prior to that, giving Plaintiff ample
(continued...)

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251–52 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. <u>Id.</u> at 587.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . . or show[]

_____

[4]/(...continued)
time to find new counsel and respond to the Motion in a timely manner. Moreover, notwithstanding Plaintiff's failure to file any opposition to the Motion, the Court permitted Plaintiff to give testimony in support of her position during the hearing held on October 23, 2014. The Court therefore DENIES Plaintiff's motion for a continuance.

that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 585. "[T]he requirement is that there be no genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48 (emphasis in original). Also, "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Likewise, the nonmoving party "cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003).

The Court notes that Plaintiff is proceeding pro se.[5] The Ninth Circuit has repeatedly cautioned that pro se litigants must be treated with liberality. See, e.g., Waters v. Young, 100 F.3d 1437, 1441 (9th Cir. 1996) ("As a general matter, this court

---

[5] At the time Plaintiff filed the operative Third Amended Complaint, she was represented by counsel; however, on June 27, 2014, the Magistrate Judge granted Plaintiffs' counsel's motion to withdraw. (Doc. No. 115.)

has long sought to ensure that pro se litigants do not unwittingly fall victim to procedural requirements that they may, with some assistance from the court, be able to satisfy."). Thus, when considering a motion for summary judgment against a pro se plaintiff, the Court must consider as evidence the pro se party's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where the pro se party attested under penalty of perjury that the contents of the motions or pleadings are true and correct. <u>Jones v. Blanas</u>, 393 F.3d 918, 923 (9th Cir. 2004).

Nonetheless, pro se litigants must follow the same rules of procedure that govern other litigants. <u>King v. Atiyeh</u>, 814 F.2d 565, 567 (9th Cir. 1987). "Ignorance of court rules does not constitute excusable neglect, even if the litigant appears pro se." <u>Swimmer v. IRS</u>, 811 F.2d 1343, 1345 (9th Cir. 1987). The court is not required to provide a non-prisoner pro se litigant with notice of the summary judgment rules. <u>Bias v. Moynihan</u>, 508 F.3d 1212, 1223 (9th Cir. 2007).

**DISCUSSION**

In this instant Motion, the County seeks summary judgment as to all claims in the Third Amended Complaint.

## I.     Section 1983 Claims

Plaintiff's federal claims against the County are

brought under 42 U.S.C. § 1983, which states that "[e]very person who, under color of any statute ... custom, or usage of any State ... subjects, or causes to be subjected, any ... person within the jurisdiction of [the United States] to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." Neither state officials nor municipalities are vicariously liable for the deprivation of constitutional rights by employees. <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978). Rather, a plaintiff wishing to bring federal civil rights claims against a local government "must establish that the local government had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation suffered." <u>A.E. ex rel. Hernandez v. County of Tulare</u>, 666 F.3d 631, 636 (9th Cir. 2012); <u>see also</u> <u>Monell</u>, 436 U.S. at 691.

In order to establish liability for governmental entities under <u>Monell</u>, a plaintiff must prove: (1) that she was deprived of a federal constitutional or statutory right, and "(2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional [or statutory] right; and, (4) that the policy is the moving force behind the constitutional [or statutory] violation." <u>Dougherty v. City of Covina</u>, 654 F.3d 892, 900 (9th Cir. 2011); <u>see also</u> <u>Jenson v. City of Oxnard</u>, 145 F.3d 1078, 1082 (9th Cir. 1998).

12

**A.    Whether Plaintiff's Constitutional Rights Were Violated**

In determining whether Plaintiff's <u>Monell</u> claims survive the instant summary judgment motion, the Court first turns to the issue of whether Plaintiff was deprived of a federal constitutional or statutory right. <u>Jenson v. City of Oxnard</u>, 145 F.3d at 1082. Here, Plaintiff alleges that Officer Cameros's use of the Taser against her constituted excessive force in violation of the Fourth Amendment. (Third Am. Compl. ¶¶ 22-23.)

The Fourth Amendment requires that courts examine the objective reasonableness of a particular use of force to determine whether it was indeed excessive. <u>Graham v. Connor</u>, 490 U.S. 386, 394–95, 398 (1989); <u>see also</u> <u>Maxwell v. Cnty. of San Diego</u>, 697 F.3d 941, 951 (9th Cir. 2012). To assess objective reasonableness, courts weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." <u>Graham</u>, 490 U.S. at 396 (citation and internal quotation marks omitted). Stated another way, the Court must "balance the amount of force applied against the need for that force." <u>Meredith v. Erath</u>, 342 F.3d 1057, 1061 (9th Cir. 2003).

Importantly, the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . allow[ing] for the fact that police officers are

13

often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving . . . ." Graham, 490 U.S. at 396-97. Further, an officer is not required to use the least amount of force possible. See Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994) ("[T]he appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them.").

First, the Court considers the amount of force and the extent to which that force intruded on Plaintiff's Fourth Amendment rights. Here, Plaintiff challenges Officer Cameros's use of the Taser against her. The record supports the conclusion that the Taser was used on Plaintiff three times: once in dart mode, and twice in drive-stun mode.[6/] The Ninth Circuit has

_____

[6/] Officer Cameros states that he used the Taser three times on Plaintiff: once in dart mode, and twice in drive-stun mode. (Mot., Ex. K at ¶ 10.) Plaintiff states, however, that she was tased five times. (Mot., Ex. E at 104.) Nevertheless, the County has introduced evidence supporting the conclusion that the Taser was used on Plaintiff three, rather than five, times. Specifically, the data downloaded from the Taser states that it was deployed four times on November 2, 2010: once at 7:20 a.m., three times at 9:51 a.m., and one time at 10:46 a.m. (Mot., Ex. F at 2.) Plaintiff has stated that she arrived at her daughter's house on the morning of the day of the incident "at around ten in the morning"; the County states that the police arrived at the residence at approximately 9:40 a.m. (Mot, Ex. E at 67; Ex. L at ¶¶ 13-14.) It therefore appears that the parties agree that the police and Plaintiff were not in the same vicinity at 7:20 a.m., when the first Taser deployment of the day was made. Further, Plaintiff does not allege that she was hit with the Taser over a sustained, nearly hour-long time-frame (thus supporting an inference that the 10:46 a.m. deployment of the Taser was upon Plaintiff). Rather, she alleges that she was Tasered five times
(continued...)

concluded that the use of a Taser constitutes "an intermediate or medium, though not insignificant, quantum of force." Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotation marks omitted). Thus, the officers' actions constituted a "not-insignificant potential intrusion upon [Plaintiff's] Fourth Amendment rights." Marquez v. City of Phoenix, 693 F.3d 1167, 1174 (9th Cir. 2012).[7]

---

[6]/(...continued)
in short succession and then restrained and taken to the ambulance. (Third Am. Compl. ¶ 7.) Thus, the evidence supports the conclusion that only the three 9:51 a.m. firings involved the use of the Taser upon Plaintiff. As to the 7:20 a.m. and 10:46 a.m. firings, the County has introduced evidence that these two firings constituted "spark tests" that Officer Cameros conducted in accordance with his training in the use of the Taser by the Hawaii County Police Department. (Mot., Ex. K at ¶ 12-13; Ex. P at ¶¶ 7-8.) Plaintiff has introduced no evidence, as opposed to her bare allegations, that calls into question this account of the use of the Taser on November 2, 2010. The Court can therefore conclude as a matter of law that the Taser was deployed three times against Plaintiff. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

[7]/ The Court notes that it appears the parties dispute whether the Taser was ever actually effective against Plaintiff. The County has introduced evidence that it was not, in light of the fact that Plaintiff remained standing while being Tasered. (Mot. at 15; Mot., Ex. P.) Plaintiff has stated, however, that she did "feel" the Taser, even though she remained standing. (Mot., Ex. E at 102-03.) The Court need not make a determination as to the effectiveness of the Taser, however, because, even assuming that the Taser was effective all three times it was used on Plaintiff, the Court still concludes that, under the circumstances, because Plaintiff continued to resist restraint until after the Taser was fired the third time, the amount of
(continued...)

15

Next, the Court must balance Plaintiff's Fourth
Amendment interests against the governmental interests at stake.
In so doing, the Court must consider the severity of the crime at
issue, whether Plaintiff posed an immediate threat to the safety
of the officers or others, and whether Plaintiff actively
resisted arrest or attempted to escape. <u>Graham</u>, 490 U.S. at 396.
Ultimately, the balancing of the use of force against the
government's interest "amounts to determining whether the force
employed was greater than is reasonable under the circumstances."
<u>Drummond ex rel. Drummond v. City of Anaheim</u>, 343 F.3d 1052, 1058
(9th Cir. 2003).

Here, the relevant factors favor a finding that the use
of an intermediate level of force was reasonable under the
circumstances. Upon arriving at the scene, the officers found
Plaintiff "ranting and raving in a loud voice in an unknown
language" and "waiving her arms." (Mot., Ex. I at ¶¶ 6, 9.). The
officers did not immediately engage in a physical confrontation
with Plaintiff; rather, they (and the paramedics) first made
several attempts to communicate with her, calm her down, and
persuade her to voluntarily go to the hospital. (Mot., Ex. I at ¶
9; Ex. B. at 26; Ex. J at ¶ 5..)

When these attempts failed, Officer Kahiwa touched

---

[7]/(...continued)
force used was not excessive.

Plaintiff's hand in an effort to communicate with her; however, Plaintiff immediately yanked her arm away and continued to "rant and rave in an angry manner while waving her arms." (Id. at ¶ 10; Ex. B at 29) When the paramedics attempted to persuade Plaintiff to voluntarily get on a gurney to be transported to an ambulance, Plaintiff ran to her car, got in the driver's seat, and picked up a cane. (Mot., Ex. L at ¶ 7.) The police officers and paramedics reasonably believed that Plaintiff was not capable of safely driving a car in her current state, and that she would be a danger to herself and others behind the wheel. (Mot., Ex. I at ¶ 11; Ex. J at ¶ 6; Ex. L at ¶ 7.) Throughout the officers' attempts to get Plaintiff out of her car, she continued to yell incoherently, and upon finally being removed from the car, she continued to resist being restrained or brought to the ambulance. (Mot., Ex. I at ¶ 12; Ex. K at ¶ 8; Ex. L at ¶ 10.)

Nevertheless, it was only after Plaintiff bit Officer Kahiwa's arm that Officer Cameros deployed the Taser. (Mot., Ex. K at ¶ 10; Ex. L at ¶ 11.) Plaintiff herself admits that she had, at the point she was Tasered, bitten a police officer (albeit, Plaintiff believed she had bitten two different officers (see Mot., Ex. E at 108)). Thus, Plaintiff had at that point committed the crime of assault against a law enforcement officer under Hawaii law, Haw. Rev. Stat. § 707-712.5, was resisting the officers' attempts to restrain her, and appeared to present a

danger to the officers, herself, and others.

The Ninth Circuit has confirmed that some amount of force is justified in restraining a mentally ill person to prevent her from injuring herself or the arresting officers. Drummond, 343 F.3d at 1059. Here, in light of Plaintiff's active resistence and the danger the officers believed she posed, the Court cannot conclude that it was altogether unreasonable for the officers to utilize an intermediate level of force to restrain her. See, e.g., Gregory v. County of Maui, 523 F.3d 1103, 1107-08 (9th Cir. 2008) (finding the use of force reasonable, where the plaintiff appeared to be in an altered state, was acting in an aggressive manner and refusing to comply with the officers' requests, and where the officers first confronted the plaintiff verbally, and only then attempted to restrain him); Marquez, 693 F.3d at 1175-76 (finding the use of at least nine cycles from a Taser in drive-stun mode was reasonable under the circumstances, where the plaintiff was actively resisting arrest and appeared to pose an immediate threat to the officers and others).

Moreover, the Court notes that, while it is undisputed that Plaintiff suffers from mental illness, this case is distinguishable from the Drummond case, in which the Ninth Circuit held that Drummond's "mental illness must be reflected in any assessment of the government's interest in the use of force," because Drummond was unarmed and "emotionally distraught." 343

18

F.3d at 1058. Unlike the police in <u>Drummond</u>, the officers here did not immediately use force upon encountering Plaintiff, but rather first attempted to verbally coax her into leaving her daughter's house and getting into the ambulance. <u>See</u> <u>id.</u> at 1054-55 (noting that the officers immediately knocked Drummond - who was not resisting - to the ground, cuffed his arms behind his back, and placed their knees on his back, making it difficult for him to breathe and ultimately rendering him unconscious); <u>see also</u> <u>Miller v. Clark Cnty.</u>, 340 F.3d 959, 967 (9th Cir. 2003) (stating that it was "highly relevant" that the officers "attempted less forceful means of apprehension before applying the force that [was] challenged").

Further, at the time the officers used "severe" force on Drummond, he was already handcuffed on the ground and was not resisting arrest. <u>Id.</u> at 1059. Conversely, here, when the officers used the Taser, Plaintiff was still actively resisting the officers; Plaintiff herself admits that she was "belligerent and upset" and that she bit an officer. (Mot., Ex. E at 89, 108.) Thus, even considering Plaintiff's mental illness, because she appeared to pose a threat to herself and others, resisted arrest, and bit Officer Kahiwa, the officers' use of force here was not objectively unreasonable. <u>See</u> <u>Drummond</u>, 343 F.3d at 1059 (finding the use of severe force unreasonable where Drummond did not pose a danger to himself or others, as he was already subdued and

handcuffed and was not resisting arrest); <u>Deorle v. Rutherford</u>,
272 F.3d 1272, 1282-83 (2001) (finding the use of less than
deadly force unreasonable where a mentally "unstable" individual
was on his own property, was not threatening to flee, was
unarmed, and had not harmed or attempted to harm anyone).

In sum, although the officers used an intermediate,
"not-insignificant" level of force in the instant case, the Court
concludes that it was justified under the circumstances and
therefore reasonable. While the Court is sympathetic to Plaintiff
and acknowledges that the use of a Taser on an unarmed, mentally
ill woman is hardly a welcome outcome, it nevertheless concludes
that this use of force does not rise to the level of a
constitutional violation in the particular circumstances before
the Court here. <u>See</u> <u>Graham</u>, 490 U.S. at 396 ("Not every push or
shove, even if it may later seem unnecessary in the peace of a
judge's chambers . . . violates the Fourth Amendment." (citation
omitted)). The Court therefore finds that the officers did not
violate Plaintiff's Fourth Amendment rights.

**B.  Whether The Alleged Constitutional Violation was
     Inflicted Pursuant to a Municipal Policy**

"If there is no constitutional violation, there can be
no municipal liability." <u>Long v. City and Cnty. of Honolulu</u>, 378
F. Supp. 2d 1241, 1246 (D. Haw. 2005) (citing <u>City of Los Angeles
v. Heller</u>, 475 U.S. 796, 799 (1986)). Thus, because the Court
finds that the officers here did not violate Plaintiff's Fourth

Amendment rights, her 42 U.S.C. § 1983 claims against the County
must necessarily fail. Nevertheless, even assuming the officers
did use excessive force in violation of Plaintiff's Fourth
Amendment rights, her § 1983 claims against the County would
still fail because Plaintiff has not demonstrated that any such
violation was inflicted pursuant to a municipal policy.

Even assuming a constitutional violation, the County
may only be held liable under 42 U.S.C. § 1983 if an
unconstitutional action "implements or executes a policy
statement, ordinance, regulation, or decision officially adopted
and promulgated by that body's officers." <u>Monell</u>, 436 U.S. at
690. A municipal defendant is liable only "where the entity's
policies evince a 'deliberate indifference' to the constitutional
right and are the 'moving force behind the constitutional
violation.'" <u>Edgerly v. City and Cnty. of San Francisco</u>, 599 F.3d
946, 960 (9th Cir. 2010).

A "policy" is a "deliberate choice to follow a course
of action made from among various alternatives by the official or
officials responsible for establishing final policy with respect
to the subject matter in question." <u>Young v. City of Visalia</u>, 687
F. Supp. 2d 1141, 1147 (E.D. Cal. 2009). "Absent a formal
governmental policy, [Plaintiff] must show a 'longstanding
practice or custom which constitutes the standard operating
procedure of the local government entity.'" <u>Trevino v. Gates</u>, 99

F.3d 911, 918 (9th Cir. 1996). The policy or custom "must be so persistent and widespread that it constitutes a permanent and well settled city policy." Id. Importantly, liability for improper policy or custom "may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Id.; see also Rivera v. Cnty. of Los Angeles, 745 F.3d 384, 389 (9th Cir. 2014) ("A single instance is not sufficient to show that a practice is so widespread as to have the force of law." (quotation marks omitted)).

Here, Plaintiff's Monell claims appear to rest on her allegations that the County (1) approved police reports containing evidence of the use of Tasers in violation of the Hawaii Police Department General Orders, and (2) knew that Tasers were being used excessively but did nothing about it. (Third Am. Compl. ¶¶ 21-22.) Thus, it appears Plaintiff's Monell claims are based upon a theory of ratification. "To show ratification, a plaintiff must prove that the authorized policymakers approved a subordinate's decision and the basis for it." Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)). The Ninth Circuit has found municipal liability on the basis of ratification when the officials involved "adopted and expressly approved of the acts of

others who caused the constitutional violation." <u>Trevino</u>, 99 F.3d

at 920; <u>see also</u> <u>Sheehan v. City & Cnty. of San Francisco</u>, 743

F.3d 1211, 1231 (9th Cir. 2014).

Plaintiff appears to contend that Police Chief

Kubojiri[8/] ratified the officers' conduct by approving their

police reports involving the use of Tasers and not disciplining

them, despite knowing that they were allegedly using Tasers

excessively and in violation of police rules. Ratification,

however, "generally requires more than acquiescence." <u>Sheehan</u>,

743 F.3d at 920. Plaintiff has introduced no evidence that

policymakers knew that Tasers were being used excessively by

officers and "made a deliberate choice to endorse" the officers'

actions. <u>Id.</u>; <u>see also</u> <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1348

(9th Cir. 1992). Indeed, the record is completely devoid of

evidence suggesting that there was widespread overuse of Tasers,

or that the County was aware of any such overuse. Plaintiff

alleges in her Third Amended Complaint that the Taser used by

Officer Cameros was fired 594 times from May 1, 2007 to November

2, 2010. (Third Am. Compl. ¶ 20.) Leaving aside the lack of any

---

[8/] As the County correctly notes, to succeed on a claim for
ratification, Plaintiff must show that the challenged action was
ratified by an official with "final policy making authority."
<u>Pembauer v. Cincinnati</u>, 475 U.S. 469, 482-83 (1986). Here,
pursuant to the Hawaii County Charter, the Mayor and the Chief of
Police have final policy making authority over the Hawaii County
Police Department. (Mot. at 24-25; Ex. Q (Haw. Cnty. Charter §§
7-2.4-6).)

evidentiary support for this statement, because officers are
required to conduct a spark test on their Tasers on a daily basis
at the start of their shifts, it is not clearly unreasonable that
the Taser should be fired just under 600 times over the course of
3.5 years. (See Mot., Ex. P at ¶ 8.) Even if the Court were to
conclude that this was unreasonable, there is simply no evidence
in the record to indicate that the County "made a deliberate
choice to endorse" any such excessive use of Tasers.

Further, Plaintiff's allegations involve only Officer
Cameros's use of the Taser; Plaintiff produces no evidence that
the alleged excessive Taser use is widespread throughout the
Hawaii County Police Department. Even assuming Officer Cameros's
use of the Taser was excessive, the mere failure to discipline
officers does not amount to ratification of their allegedly
unconstitutional actions. See Clouthier v. Cnty. of Contra Costa,
591 F.3d 1232, 1253-54 (9th Cir. 2010) (holding that the failure
to discipline employees, without more, was insufficient to
establish ratification).

Moreover, the County has introduced evidence that,
rather than ratifying instances of excessive force, it has a
policy and practice of investigating and, if necessary,
administering discipline in all such cases. (See Mot., Ex. M
(Decl. of Police Chief Harry S. Kubojiri) at ¶¶ 7-9.) Indeed, in
her Third Amended Complaint, Plaintiff quotes at length from the

Hawaii County Police Department rules and regulations, demonstrating that the County has in place specific policies governing the use of force, including the use of Tasers. (See Third Am. Compl. ¶¶ 9-13.) Plaintiff has introduced no evidence suggesting that the County has failed to properly implement these policies or has otherwise ratified unconstitutional conduct. See, e.g., Penigar v. County of San Bernardino, No. 12–55857, 2014 WL 931098 (9th Cir. Mar. 11, 2014) (upholding summary judgment where County submitted evidence its policies were reasonable, and claimant did not offer any evidence to the contrary).

In sum, the Court concludes that summary judgment in the County's favor is appropriate on Plaintiff's § 1983 municipal liability claims because Plaintiff has failed to demonstrate that her Fourth Amendment rights were violated and, even if she had so demonstrated, she has failed to present evidence to support a finding that the constitutional violation was the result of a longstanding policy or custom of the County. The County's Motion is therefore GRANTED insofar as it seeks summary judgment as to Counts 1 and 2 of the Third Amended Complaint.

## II. State Law Claims

Plaintiff also brings claims under Hawaii state law for "rule violations," negligence, and assault and battery. (Third Am. Compl. ¶¶ 28-35.) The Court will address each in turn.

### A. Assault and Battery

First, as to Plaintiff's claim for assault and battery, Plaintiff claims that the County is liable under a theory of respondeat superior for Officer Cameros's conduct. (Third Am. Compl. ¶¶ 33-35.) The County argues that this claim must fail because Officer Cameros is shielded from liability by the qualified or conditional privilege, and there can be no liability for the County absent liability of the individual officer. The Court agrees.

Under the doctrine of conditional or qualified privilege, nonjudicial government officials are shielded from liability for their tortious actions committed during the performance of their public duties. See Long v. Yomes, Civ. No. 11-00136, 2011 WL 4412847 at *6 (D. Haw. 2011). In order for a plaintiff to prevail in a state tort action against a nonjudicial government official, the plaintiff must "allege and demonstrate by clear and convincing proof that the official was motivated by malice and not by an otherwise proper purpose." Id. (quoting Edenfield v. Estate of Willets, Civ. No. 05-00418, 2006 WL 1041724 at * 11-12 (D. Haw. 2006)).

For claims other than defamation, courts employ an "actual malice" test. Bartolome v. Kashimoto, Civ. No. 06-00176 BMK, 2009 WL 1956278, at *1 (D. Haw. June 26, 2009). Under this test, "malice" is defined as "the intent, without justification or excuse, to commit a wrongful act[,] reckless disregard of the

law or of a person's legal rights[,] and [i]ll will; wickedness of heart." Id.; see also Awakuni v. Awana, 165 P.3d 1027, 1043 (Haw. 2007) (concluding that plaintiffs failed to overcome the conditional privilege because they failed to show that defendants "were motivated by ill will or an intention to commit, or a reckless disregard of committing, a wrongful act against any of the [plaintiffs.]").

Here, Plaintiff has provided no evidence to suggest that Officer Cameros or any of the individual officers acted with actual malice. Moreover, the Court has found no evidence of any malice or otherwise improper purpose through its own independent review of the record before it. Indeed, Plaintiff herself states that none of the officers had "any kind of grudge" against her. (Mot., Ex. E at 111.) The Court therefore must conclude that Officer Cameros is entitled to the conditional or qualified privilege under Hawaii law. Because Officer Cameros is shielded from liability by this privilege, the County cannot be held liable on a theory of respondeat superior for his actions. See Silva v. City and Cnty. of Honolulu, 2013 WL 2420902 at *20 (D. Haw. May 31, 2013); Reed v. City and Cnty. of Honolulu, 76 Hawaii 219, 227, 873 P.2d 98 (Haw. 1994). The Court therefore GRANTS the Motion as to Count 5 of the Third Amended Complaint.

B. **Negligence**

Plaintiff's state law negligence claim is based on her

27

allegation that the County negligently hired, trained, supervised, and disciplined the individual officers on the appropriate use of force. (Third Am. Compl. ¶ 31.) Importantly, however, under Hawaii law a claim for negligent supervision "may only be found where an employee is acting *outside* of the scope of his or her employment[.]" <u>Dairy Rd. Partners v. Island Ins. Co., Ltd.</u>, 92 Hawaii 398, 427, 992 P.2d 93 (2000) (emphasis in original); <u>see also</u> <u>Wong-Leong v. Hawaiian Indep. Refinery, Inc.</u>, 76 Hawaii 433, 444–45, 879 P.2d 538 (1994) (adopting the test for negligent supervision set forth in the Restatement (Second) of Torts § 317, requiring that the employee be acting outside the scope of his employment).

In this case, Plaintiff does not claim that the individual officers were acting outside the scope of their employment, nor has she provided any evidence to support such a claim. Indeed, Plaintiff specifically alleges in her Third Amended Complaint that the officers "[a]t all times material to this complaint . . . were employees of the Hawaii County Police Department acting within the scope of their employment." (Third Am. Compl. ¶ 5.) Plaintiff's claim for negligence must therefore fail. The Court GRANTS the Motion as to Count 4.

## C. Rule Violations

Finally, the Court addresses Count 3 of the Third Amended Complaint: Plaintiff's claim for "rule violations." It is

28

unclear from the allegations in Count 3 exactly what type of claim Plaintiff is trying to assert, and Plaintiff has offered no specific evidence to support this claim. It does not appear that there is a separate cause of action under Hawaii law for violation of municipal rules generally, or violation of the Hawaii County Police Department's rules and regulations specifically. Moreover, even assuming such a cause of action exists, Plaintiff has introduced no evidence, as opposed to the bare allegations in the Third Amended Complaint, to support a finding that any of the individual officers, let alone the County, violated any of the Hawaii County Police Department's rules and regulations. The Court therefore GRANTS the Motion as to Count 3.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the County's Motion for Summary Judgment on All Claims.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 27, 2014



_____
Alan C. Kay
Senior United States District Judge

Winchester-Sye v. County of Hawaii, Civ. No. 12-00592 ACK KSC, Order Granting the County's Motion for Summary Judgment.

29